**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Ramzi Abadou (SBN 222567)
One Sansome Street
Suite 1850
San Francisco, CA 94104
Telephone:  (415) 400-3000
Facsimile:  (415) 400-3001
rabadou@ktmc.com

- and -

Edward W. Ciolko (*pro hac vice forthcoming*)
Peter A. Muhic (*pro hac vice forthcoming*)
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
eciolko@ktmc.com
pmuhic@ktmc.com

*Counsel for Plaintiffs and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK URSOMANO, GIOVANNI CANONICO and URSULA CANONICO , individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>      v.<br><br>WELLS FARGO BANK, N.A., WELLS FARGO INSURANCE, INC., ASSURANT, INC., and AMERICAN SECURITY INSURANCE COMPANY,<br><br>            Defendants. | Civil Action No. 13-CV-4381 (JCS)<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      This is a proposed class action brought by plaintiffs Patrick Ursomano, Giovanni Canonico and Ursula Canonico ("Plaintiffs") individually and on behalf of all persons who have or had residential mortgage loans originated and/or serviced by Defendant Wells Fargo Bank, N.A.

("WFBNA") which at times does business as Wells Fargo Home Mortgage ("WFHM") and, in connection therewith, were required to pay for lender-placed or "force-placed" hazard insurance policies provided by Defendants Assurant, Inc., ("Assurant, Inc."), American Security Insurance Company ("ASIC") and/or other force-placed insurance provider subsidiaries of Assurant, Inc. (collectively, "Assurant") which involved the payment of a kickback in the form of below-market-rate portfolio tracking, or a commission, fee, reinsurance or any other monetary and/or nonmonetary remuneration to WFBNA or an affiliate including but not limited to Defendant Wells Fargo Insurance, Inc. ("WFI").  WFBNA, WFHM and WFI are collectively referred to herein as "Wells Fargo" and together with Assurant and ASIC are collectively referred to as "Defendants."  The allegations herein are based upon personal knowledge concerning Plaintiffs and their own acts, and upon information and belief as to all other matters.  The allegations that are not based on Plaintiffs' personal knowledge result from investigation by Plaintiffs' counsel.

2.      Plaintiffs challenge, as further described herein, Wells Fargo's practice of purchasing from Assurant force-placed hazard insurance pursuant to agreements that return a financial benefit to Wells Fargo or its affiliates.  Such agreements are unrelated to any contractual or other *bona fide* interest in protecting the lender's interest in the loan, and result in unauthorized, unjustified and unfairly inflated costs to the borrower for force-placed hazard insurance in violation of law.

3.      As a condition to funding a borrower's loan, Wells Fargo typically requires that borrowers purchase and agree to maintain hazard insurance on the secured property.

4.      When borrowers fail to maintain their hazard insurance policies, Defendants replaced those policies with more expensive policies, known as "force-placed" or "lender-placed" insurance policies.

5.      Wells Fargo and Assurant, Inc., by one of its subsidiaries and/or affiliates, have entered into a contract and/or agreement pursuant to which Wells Fargo purchases expensive force-placed insurance policies from Assurant and then forces borrowers to pay for the policies by diverting the borrowers' monthly mortgage payments and/or debiting the borrowers' escrow accounts.

6.    Such policies provide less coverage and are substantially more costly than the borrowers' original, voluntary policies, while providing improper, undisclosed, and lucrative financial benefits to lenders/servicers and/or their affiliates, as well as to providers of force-placed insurance.

7.    Further, such policies often provide unnecessary or duplicative coverage, which in turn increases the amount of the kickbacks, in that they are improperly backdated to collect premiums for time periods during which the mortgagor has no risk of loss and provide more insurance coverage than is required to protect the lender's insurable interest in the property.

8.    The charges paid by and/or assessed to Plaintiffs and members of the proposed Classes also include amounts not attributable to the cost of providing force-placed insurance but, instead, are expenses associated with servicing *all* the loans serviced by Wells Fargo.  However, Wells Fargo and other loan servicers are already compensated for tracking and monitoring loan portfolios as part of their servicing agreements.  In addition, the loan servicers have outsourced such portfolio monitoring and tracking services to force-placed insurance providers, such as Assurant, at below-market rates.  Consequently, the small percentage of borrowers who pay for force-placed insurance shoulder the costs of monitoring the servicers' entire loan portfolios – resulting, effectively, in a kickback to the servicers and the enrichment of the servicers at the borrowers' expense.  *See* Testimony of Birny Birnbaum of Behalf of the Center for Economic Justice for the Florida Office of Insurance Regulation (July 3, 2012), attached as Exhibit 1 ("Birnbaum Florida Testimony").

9.    Assurant, Inc., through its subsidiaries and affiliates, including ASIC, also agrees to reinsure the hazard insurance policies that it force-places on borrowers with subsidiaries of mortgage servicers.  This is simply a way to funnel money, in the form of ceded premiums, to servicers, again at the expense of the borrowers.

10.    While reinsurance can, and often does, serve a legitimate purpose, here it does not.

11.    Assurant, Inc., has acknowledged in its 2012 Annual Report, under the section heading, "***Segment Client Risk and Profit Sharing***", that its force-placed insurance division "write[s] business produced by their clients, such as mortgage lenders and servicers, financial

1  institutions and reinsures all or a portion of such business to insurance subsidiaries of some clients."

2  *See* Assurant 2012 10-K at p. F-55, attached as Exhibit 2; *see also* Consent Order, In the Matter of

3  American Security Insurance Company, American Bankers Insurance Company of Florida, and

4  Assurant, Inc. at 6 ("NYDFS Consent Order") attached as Exhibit 3.

5        12.   Borrowers have no say in the selection of the force-placed insurance carrier or the

6  terms of the force-placed insurance policies.  Borrowers also have no opportunity to comparison-

7  shop for force-placed insurance policies.  The terms and conditions of the insurance policy, as well

8  as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated

9  between the borrower and the insurer.  *See* Testimony of J. Robert Hunter, of the Consumer

10  Federation of America dated May 17, 2012 at 10 ("Hunter NYDFS Testimony"), attached as Exhibit

11  4.

12        13.   For their part, servicers like Wells Fargo have no incentive to shop for the best rate.

13  Rather, servicers are financially motivated to utilize the insurer that offers the best financial benefit

14  to the servicer in terms of commissions and/or ceded reinsurance premiums that are established as

15  part of the secret arrangements among the servicers, insurers and their affiliates.  Further, because

16  the servicer's kickback premium is directly tied to the price of the policy, the servicer actually has an

17  incentive to purchase the highest-priced insurance – reflecting an interest of the servicer

18  diametrically opposed to that of the borrower who is being charged for the insurance.  *See, e.g.*,

19  Hunter NYDFS Testimony at 1.

20        14.   As noted by Birny Birnbaum:

21           [t]he incentives and potential for abuse in the administration of LPI
             are great.  Consumers do not request the insurance, but are forced to
22           pay for it.  The cost of LPI [lender placed insurance] is much higher
             than a policy the borrower would purchase on his or her own.
23           Lenders have incentive to force-place the insurance because the
             premium includes a commission to the lender and, in some cases, the
24           insurance is reinsured through a captive reinsurer of the lender,
             resulting in additional revenue to the lender from the force-placement
25           of the coverage.

26  *See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic

27  Justice, Before the U.S. House of Representatives Subcommittee on Insurance, Housing and

28

Community Opportunity Committee on Financial Services, p. 6 ("Birnbaum July 28, 2011 Testimony"), attached as Exhibit 5.

15.    Servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider, such as Assurant.  The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property.  In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf of and for the benefit of the servicer.  Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral.  *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (Nov. 10, 2010, 12:00 pm), http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html (referred to herein as "Ties to Insurers") (last visited Sept. 19, 2013).

16.    The web of relationships among the Defendants and the arrangements between and among them served to funnel profits to Wells Fargo, Assurant and their subsidiaries and affiliates.

17.    As one journalist has observed:

> In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention. But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions.   Policies are sometimes backdated to cover periods that have already passed.
>
> In essence, critics say, high-priced insurance policies cover a time when no events happened. And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business. But homeowners don't know that."

*See* Dave Lieber, *Everyone Profits Off Force-Placed Insurance, Except Homeowner*, Star-Telegram (Oct. 1, 2011) attached as Exhibit 6.

18.    These very practices have drawn the scrutiny of state and federal bodies charged with the oversight of force-placed insurance.  In October 2011, a number of mortgage servicers and insurers, including Defendants, received subpoenas from the New York Department of Financial

Services ("NYDFS") with respect to lender-placed insurance activities dating back to September 2005.

19.     The NYDFS conducted hearings on May 17, 18 and 21, 2012 during which the force-placed insurance practices of Defendants, their affiliates, subsidiaries and bank partners were among the topics addressed by witnesses and in written testimony.  Superintendent Benjamin Lawsky noted in his opening statement that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums for force-placed insurance than regular homeowners insurance; 2) extraordinarily low loss ratios; 3) harm to distressed borrowers; 4) lack of competition in the market; 5) force-placed insurance has become a major profit center for both banks and insurers; and 6) "tight relationships between banks, their subsidiaries and insurers."   As Superintendent Lawsky summarized the net result of these practices:

> Take the form of large commissions being paid by insurers to the banks for what appears to be very little.  In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies.  Thus, the banks pay high premiums for coverage that is highly profitable and then those profits revert right back to the banks through reinsurance agreements.

*       *       *       *

> In sum, when you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions….

Opening Statement of Benjamin M. Lawsky, Superintendent of NYDFS, May 17, 2012 attached as Exhibit 7.

20.     The NYDFS heard testimony from several of the Defendants as well as noted experts in the course of its force-placed insurance investigation. *See, e.g.*, Testimony of John Frobose, President of ASIC, submitted to the NYDFS ("Assurant NYDFS Testimony"), attached as Exhibit 8; Testimony of Birny Birnbaum on behalf of the Center for Economic Justice, May 21, 2012 ("Birnbaum NYDFS Testimony") attached as Exhibit 9; and the Hunter NYDFS Testimony.

21.     As a result of its investigation, NYDFS found:

> that insurers and banks built a network of troubling relationships and payoffs that helped drive premiums sky high.  Those improper

> practices created significant conflicts of interest and saddled
> homeowners, taxpayers, and investors with millions of dollars in
> unfair and unnecessary costs.
>
> *        *        *
>
> Indeed, even though banks and servicers are the ones who choose
> which force-placed insurance policy to purchase, the high premiums
> are ultimately charged to homeowners…

*See* New York Department of Financial Services Press Release dated March 21, 2013 ("NYDFS March 21, 2013 Press Release") attached as Exhibit 10.

22.   The NYDFS investigation further found that these practices resulted in a market characterized by "reverse competition." The insurers competed by offering servicers and lenders a share in the profits, rather than by offering lower prices. *Id.*

23.   The National Association of Insurance Commissioners ("NAIC") is the standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories. The NAIC establishes standards and best practices, conducts peer review, and coordinates regulatory oversight. Pursuant to these duties, NAIC also investigated the force-placed insurance industry and found those practices so troubling that it held its own public hearings on August 9, 2012. *See* NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules, attached hereto as Exhibit 11. The NAIC, like the NYDFS, found there to be enough troublesome information regarding the force-placed insurance industry and its associated practices to warrant its full attention.

24.   The NAIC includes a discussion of "reverse competition" and lender-placed insurance on its website:

> A key regulatory concern with the growing use of lender-placed
> insurance is "reverse competition," where the lender chooses the
> coverage provider and amounts, yet the consumer is obligated to pay
> the cost of coverage. Reverse competition is a market condition that
> tends to drive up prices to the consumers, as the lender is not
> motivated to select the lowest price for coverage since the cost is born
> by the borrower. Normally competitive forces tend to drive down
> costs for consumers. However, in this case, the lender is motivated to
> select coverage from an insurer looking out for the lender's interest
> rather than the borrower.

http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm (last visited Sept. 19, 2013).

25.     As a result of the NYDFS investigation into force-placed insurance practices, the NYDFS and Assurant, Inc. and its subsidiaries entered into a Consent Order pursuant to which Assurant, Inc. and its subsidiaries agreed to make changes in their force-placed insurance practices and to reduce the rates charged to borrowers whose insurance was force-placed.  Certain borrowers whose insurance was force-placed will be entitled to restitution of a portion of the force-placed premium which they paid.  Assurant, Inc. and its subsidiaries also agreed to pay the sum of fourteen million dollars ($14,000,000) to the NYDFS.  *See* NYDFS Consent Order.

26.     Defendants unlawful actions include, as described in further detail below, *inter alia:* (a) abuse of their authority to force-place hazard insurance to generate unjustified profits for themselves which were not disclosed to borrowers whose insurance was force-placed; (b) electing to purchase higher-priced insurance policies from exclusive force-placed insurance providers for their mutual benefit; (c) entering into pre-arranged agreements to acquire high-priced, force-placed insurance, thereby diminishing any benefit to be gained by borrowers through open market or competitive purchasing environment; (d) entering into pre-arranged agreements designed to yield exorbitant force-placed insurance charges to members of the Classes in order to maximize Defendants' own profits without any regard whatsoever for competitive pricing, to the detriment of borrowers; (e) backdating the force-placed insurance policies to charge for retroactive and unnecessary coverage; (f) entering into captive reinsurance arrangements designed to funnel premiums to Defendants rather than as a vehicle to transfer risk and protect the interests of the lender; (g) giving and receiving "kickbacks" in the form of purported fees, payments, unearned commissions, "rebates" and/or other things of value from providers of force-placed insurance (including Assurant and its subsidiaries and affiliates) for the procurement of the force-placed policies; (h) improperly exploiting their ability to manage and gain access to escrow funds in breach of fiduciary obligations relating to the management of escrow funds in order to increase profits; (i) misrepresenting the reasons for the high cost of force-placed insurance to Plaintiffs and members of the Classes; (j) failing to inform Plaintiffs and members of the Classes that force-placed insurance practices did not only protect its interest in Plaintiffs' and members of the Classes' properties but also generated unwarranted profits for themselves; (k) misrepresenting that force-placed hazard

1    insurance costs more because it is provided without underwriting; (l) tying the purchase of insurance

2    to a requirement that borrowers effectively pay a kickback or an explicit commission to an affiliate,

3    and (m) force-placing hazard insurance coverage in excess of the amount required to protect the

4    lender's insurable interest in the property.

5            27.    Plaintiffs assert herein the following claims against Wells Fargo: (1) violation of the

6    Bank Holding Company Act, 12 U.S.C. § 1972, *et seq*., ("BHCA"); and (2) violation of California

7    Business and Professions Code § 17200.

8            28.    Plaintiffs herein asserts a claim against Assurant and their subsidiaries and affiliates

9    for violation of California Business and Professions Code § 17200.

10           29.    Plaintiffs do not challenge the rates of the force-placed hazard insurance as excessive

11   nor Defendants' right to force-place insurance.  Rather, Plaintiffs challenge, among other things, and

12   as further described herein, Defendants' *decision to purchase* force-placed hazard insurance from

13   insurers that provide a financial benefit to Defendants and/or their affiliates and at prices that far

14   exceed borrower-purchased hazard insurance (while providing substantially less coverage) and

15   imposing charges unrelated to the provision of force-placed insurance on borrowers who were force-

16   placed.  On information and belief, these decisions were made and/or approved by senior executives

17   at WFBNA from its corporate headquarters in San Francisco.  As such, Plaintiffs seek statutory and

18   compensatory damages, as well as restitution/disgorgement for Defendants' unjust enrichment.

19           30.    In all respects, this conduct attributable to all Defendants herein is without

20   justification, serving only to enrich Defendants at a significant cost to the borrowers who were

21   forced to pay for or charged for force-placed insurance.

22                              **JURISDICTION AND VENUE**

23           31.    This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28

24   U.S.C. § 1331.

25           32.    This Court also has supplemental jurisdiction over Plaintiffs' state law claims

26   pursuant to 28 U.S.C. § 1367, because the claims arose out of the same transaction and occurrence as

27   the BHCA claims—specifically, all claims arose out of Wells Fargo's kickback scheme—and are so

28   related to Plaintiffs' BHCA claims that they form part of the same case or controversy.

33.     This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiff and many members of the Classes are citizens of different states than Defendants.  The amount in controversy in this action exceeds $5,000,000, and there are more than 100 members in the proposed Classes.

34.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendant WFBNA's principal place of business is located in San Francisco, CA, defendant Assurant, Inc. operates a substantial portion of its force-placed insurance business under the trade name "Assurant Specialty Property" in this district, and all Defendants regularly conduct business and therefore reside in this district, and a substantial part of the events giving rise to the claims occurred in this district.

## **PARTIES**

**Plaintiffs**

35.     Plaintiffs Giovanni and Ursula Canonico, husband and wife, reside in Hemet, California and are citizens of California.

36.     On or about March 24, 2005 the Canonicos obtained a mortgage loan in the amount of $67,000 from World Savings Bank, FSB secured by their primary residence.  *See* April 1, 2005 Canonico First Deed of Trust ("Canonico Mortgage"), attached hereto as Exhibit 12.

37.     Plaintiff Patrick Ursomano resides in Gladstone, Oregon and is a citizen of Oregon.

38.     On or about January 17, 2006 Ursomano obtained a mortgage loan in the amount of $70,000 from World Savings Bank, FSB secured by his primary residence.  *See* January 23, 2006 Ursomano First Deed of Trust ("Ursomano Mortgage"), attached hereto as Exhibit 13.

39.     World Savings Bank, FSB was later acquired by Wells Fargo (see, https://www.wellsfargo.com/about/corporate/worldsavings) (last visited Sept. 19, 2013) and on information and belief Wells Fargo thereafter assumed the mortgage and servicing rights to the Canonico Mortgage and the Ursomano Mortgage.

**Defendants**

40.     Defendant Wells Fargo Bank, N.A. ("WFBNA") is a national banking association chartered in South Dakota with its principal place of business in San Francisco, California.  Wells

1  Fargo Home Mortgage ("WFHM") is an unincorporated division of WFBNA.  WFHM handles the

2  mortgage servicing business for Wells Fargo, including the mortgage loans and lines of credit of

3  California homeowners and homeowners across the United States.  At all relevant times, WFHM's

4  conduct was approved, authorized and/or ratified by WFBNA.

5        41.    On information and belief, WFBNA's headquarters in San Francisco were the locus

6  of decisions and actions relating to the conduct alleged herein, including the decision (and/or

7  ratification of decisions) to enter into agreements with Assurant to force-place insurance on

8  borrowers throughout the United States with Assurant that generated kickbacks in the form of

9  below-market-rate portfolio tracking, or a commission, fee, reinsurance or any other monetary and/or

10  nonmonetary remuneration to a WFBNA affiliate, including WFI.

11        42.    Defendant Wells Fargo Insurance, Co. ("WFI") is an affiliate of WFBNA with its

12  principal place of business in St. Louis Park, Minnesota.  On information and belief, WFI receives

13  from the Assurant Defendants commissions or other monetary and/or nonmonetary remuneration

14  directly or indirectly associated with Wells Fargo's force-placed insurance scheme.

15        43.    Defendant Assurant, Inc. is a Delaware corporation and "is a provider of specialized

16  insurance products and related services in North America and select worldwide markets."  *See*

17  Assurant 10-K, p. 1. Assurant, Inc. "operates its business through four business segments:  Assurant

18  Employee Benefits, Assurant Health, Assurant Solutions and Assurant Specialty Property."  *Id.*

19  Assurant, Inc., together with QBE Insurance, controls about 90% of the force-placed insurance

20  market.  *See* Mary Williams Walsh, *New York Investigates Insurer Payments to Banks*, N.Y. Times,

21  p. B1 (May 22, 2012).

22        44.    Assurant, Inc. offers its force-placed ("lender-placed") insurance products through the

23  Assurant Specialty Property segment.  "The largest product line within Assurant Specialty Property

24  is homeowners insurance, consisting principally of fire and dwelling hazard insurance offered

25  through [Assurant's] lender-placed programs."  *See* Assurant, Inc. Form 10-K, p. 4.  Assurant, Inc.

26  Executive Vice President, Gene Mergelmeyer, heads Assurant, Inc.'s force-placed operations.

27        45.    Assurant, Inc. uses "a proprietary insurance-tracking administration system linked

28  with the administrative systems of our clients to continuously monitor the clients' mortgage

1  portfolios to verify the existence of insurance on each mortgaged property and identify those that are

2  uninsured" and when a lapse is confirmed "a lender-placed policy is procured by the lender." *Id*.

3       46.    Defendant American Security Insurance Company ("ASIC") is a Delaware

4  corporation with its principal place of business in Atlanta, Georgia, and maintains substantial

5  operations in California.  ASIC is a subsidiary of Assurant, Inc. that does business in California and

6  throughout the United States.  In addition to underwriting force-placed insurance policies, ASIC also

7  provides services to Wells Fargo "to track borrower compliance with insurance obligations and to

8  place lender-placed insurance for Wells Fargo" pursuant to a Master Services Agreement between

9  ASIC and Wells Fargo.  *See* Declaration of Ronald Wilson, available at *Kunzelman v. Wells Fargo,*

10  Docket No. 11-cv-81373 (S.D. Fla. Jan. 26, 2012) (ECF No. 26-2) ("Wilson Decl.").

11  **FACTUAL ALLEGATIONS**

12  **Defendants Abused Force-Placed Insurance to Generate Hidden and Unearned Profits**

13       47.    On information and belief, Assurant and Wells Fargo have entered into contracts

14  relating to all aspects of the force-placement of hazard insurance for borrowers whose loans were

15  serviced by Wells Fargo.

16       48.    Each loan serviced by Wells Fargo is secured by a mortgage or deed of trust on the

17  underlying property.

18       49.    In order to ensure that the mortgagee's interest in the secured property is protected,

19  mortgage loan contracts typically allow the lender or third-party servicer to "force-place" insurance

20  when the homeowner fails to maintain the insurance.  For example, Paragraph 5 of the Canonico

21  Mortgage and the Ursomano Mortgage contains such a provision.  Thus, the failure of a borrower to

22  maintain hazard insurance is clearly contemplated by the mortgage contract and such a failure by the

23  borrower does not result in a material failure to perform under the mortgage contract.

24       50.    The discretion afforded Defendants, however, to force-place insurance is limited by

25  the bounds of reasonable conduct and by the express terms of the mortgage itself.  Upon information

26  and belief, Wells Fargo routinely exceeds the bounds of reasonableness and the spirit, intent and

27  letter of the mortgage contract by force-placing insurance in a manner and in amounts that are not

28  required to protect the lender's interest in the property and through other conduct described herein

with respect to the force-placement of insurance.  The typical mortgage contract does not disclose that the lender or other servicer will receive a financial benefit in connection with the force-placed insurance policy.  Instead, the contract limits the authority of the mortgage servicer to force-place insurance sufficient to protect the lender's interest in the secured property.

51.     These lender-placed or force-placed insurance policies are almost always more expensive than standard insurance coverage, as evidenced by Plaintiffs' policies.  Such policies can cost as much as ten times more than standard policies.  NYDFS March 21, 2013 Press Release.

52.     While the force-placed insurance policy is for the benefit of the lender, the excessive cost is passed on to the borrower.  *Id.*

53.     Once a lender and/or servicer receives evidence that a borrower has obtained his/her own insurance policy, the forced placed coverage should be fully or partially canceled.

**Mortgage Loan Lenders And/Or Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements To Refer Borrowers To Certain Force-Placed Insurance Providers**

54.     The force-placement of insurance policies is a very lucrative business for the loan servicers.  Here, Wells Fargo force-placed Plaintiffs' insurance with Assurant in accordance with a pre-arranged agreement and in such a way as to receive and maximize its own financial benefit.  Wells Fargo beneffited because it placed Plaintiffs' force-placed insurance policies with Assurant, which had already agreed to share revenue with Wells Fargo in the form of below-market-rate portfolio tracking, a commission, fee, reinsurance or any other monetary and/or nonmonetary remuneration.  Indeed, as Birny Birnbaum of the Center for Economic Justice, another experienced and noted expert in the area of force-placed insurance, testified:

> Servicers have financial incentives to force-place the insurance because the premiums include commissions and other considerations for the servicer.  With some servicers, the insurance is reinsured through captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement coverage.

*See* Birnbaum NYDFS Testimony at 15.

55.     Wells Fargo and Assurant profited from the ability to exploit their authority to force-place insurance in several ways, as depicted in the following graphic from *American Banker*:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

# Sharing in the Profits

How servicers make money arranging force-placed coverage

**Commissions**

To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer

Servicer advances premiums to insurer

Insurer pays portion of premium back to subsidiary as a commission

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

**Reinsurance**

To replace lapsed coverage, servicer buys policy on home from insurer

Servicer advances premiums to insurer

Subsidiary of servicer reinsures part of the policy, gets a cut of premiums

If necessary, subsidiary buys letter of credit from another party

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale





16 **Defendants' Profit-Making Commission Arrangements**

17     56.     Under the commission arrangement, the provider of the force-placed insurance policy

18 pays a commission either directly to the servicer or to a subsidiary posing as an insurance "agent."

19 Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is

20 simply an affiliate or subsidiary of the servicer and exists only to collect the kickbacks or

21 commissions paid by the force-placed insurance provider.

22     57.     Assurant has acknowledged that it pays commissions in connection with force-placed

23 insurance:

24     Insurance Commissions to Banks, Servicers, and Affiliates

25     Through my experience working with banks and mortgage servicers,
     it has been communicated to me by those financial institutions that
26     the purpose of paying insurance commissions to their licensed and
     appointed insurance brokerage/agency affiliates is to compensate
27     those agents/brokers for the performance of activities which support
     Assurant Insurance's lender-placed insurance program.

28

Assurant NYDFS Testimony at 10.

58.     Assurant has agreed to cease paying these commissions with respect to borrowers in New York in the NYDFS Consent Order.   *See* NYDFS Consent Order at 9.

59.     J. Robert Hunter of the Consumer Federation described these practices in his testimony before the NYDFS in connection with the Department's inquiry into force-placed insurance practices:

> [i]n some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers.

*See* Hunter NYDFS Testimony at 1.

**Wells Fargo Improperly Passed on Servicing Costs to Borrowers Who Were Required to Pay for Force-Placed Insurance**

60.     Moreover, Wells Fargo coordinated with Assurant to perform its servicing functions. In so doing, Wells Fargo transferred the cost of servicing to Assurant.  As a result, these servicing costs were included in the force-placed insurance premiums paid by Plaintiffs and members of the Classes.  Because Assurant was returning a large percentage of the borrowers' premiums to Wells Fargo, this arrangement functioned as an undisclosed kickback to Wells Fargo.

61.     Industry insiders acknowledge that force-placed insurance premiums are "a lot more expensive than other alternatives" because the administrative costs "are bundled into the costs of the premium."  *See* Testimony of Joseph Marcowicz (PRP Claims), Public Hearing on Private Lender-Placed Insurance, Property and Casualty Insurance (C) Committee Market Regulation and Consumer Affairs (D) Committee, National Association of Insurance Commissioners, August 9, 2012, ("Markowicz       Testimony")       attached       as       Exhibit       14,       available       at http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_te stimony_markowicz.pdf (last visited Sept. 19, 2013).  Mr. Markowicz also confirmed that administrative costs "tend to keep premium costs high" because expenses "which include the administrative work of the letter campaigns and tracking services provided to the loan servicer" are

1    bundled into the premium." *Id.* In effect, Assurant is providing below cost administrative services

2    to servicers like Wells Fargo, and recouping those costs from borrowers whose insurance is force-

3    placed. Through this arrangement, Wells Fargo receives a kickback each time it places force-placed

4    insurance with its exclusive, high-priced provider, Assurant. In turn, Assurant also receives a

5    kickback in the form of payment of such monitoring and tracking costs, as these costs are

6    unnecessarily billed to force-placed borrowers.

7          62.    The NYDFS recognized that this practice has resulted in inflated premiums. The

8    NYDFS Consent Order bans this practice in the future with respect to force-placed policies provided

9    for certain borrowers in New York. *See* NYDFS Consent Order at 10.

10         63.    John Frobose, President of ASIC, has also confirmed this practice, acknowledging

11    that, "ASIC monitors policy status for possible lapses in coverage, such as when a homeowner's

12    standard policy has been cancelled or is about to expire." *See* Assurant NYDFS Testimony.

13         64.    While servicers profit greatly from their business of force-placing insurance, upon

14    information and belief, they maintain a shroud of secrecy and do not separately report their income

15    from payments received from providers of force-placed insurance. However, according to a recent

16    article published by *American Banker*, "a cursory review of force-placed insurers' financials

17    suggests that the business brings servicers hundreds of millions of dollars every year." *See* Ties to

18    Insurers, *supra* (noting that servicers demand generous commissions and other payments in return

19    for their referrals).

20    **Defendants Cannot Justify the High Cost of Force-Placed Insurance**

21         65.    Servicer explanations for the high cost of force-placed insurance are "unsupported by

22    any evidence." *See* Birnbaum NYDFS Testimony at 1.

23         66.    Servicers also attempt to blame the exorbitant cost of force-placed insurance on the

24    fact that the policy is issued without the benefit of a prior inspection of the property. However,

25    according to the National Consumer Law Center, as a general matter, insurers do not routinely

26    inspect residential properties in the course of underwriting. *Id.*

27

28

67.     Force-placed insurance policies are not underwritten on an individual policy basis. Rather, servicers' contracts with force-placed insurance providers require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

68.     As J. Robert Hunter in his recent testimony before the NYDFS argued, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance."  *See* Hunter NYDFS Testimony at 5.  Yet it does not. Instead, as a result of the arrangements between those participating in monitoring, placing and administering force-placed insurance, consumers are gouged.

69.     Force-placed insurer subsidiaries are highly profitable businesses.  "Among a published ranking of companies with the strongest operating insurance subsidiaries, several bank holding companies stand out . . . . Companies with insurance subsidiaries providing force-placed property insurance were at the top of the list."  *See* http://www.mainstreet.com/print/18604 (last visited Sept. 19, 2013).  Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting.  However, as *American Banker* noted:

> [t]hough part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand.

*See* Ties to Insurers.

70.     Birny Birnbaum, in his testimony before the New York Department of Financial Services, also presented statistics collected by the NAIC reflecting nationwide loss ratios for LPI hazard insurance during the 2004-2011 period as being, on average, more than 35 percentage points lower than the ratios for commercially available homeowners policies.  *See* Birnbaum NYDFS Testimony at 9.  When confined to the period from 2007-2011, the disparity between LPI hazard insurance loss ratios and those of commercially available homeowners policies was nearly 42 percentage points.  *Id.*

71.     Moreover, because the policies are not individually underwritten, the force-placed insurer is spared the costs associated with individual underwriting, which should actually decrease the cost of insurance.  *See* Birnbaum NYDFS Testimony at 26.

**As Servicer, Wells Fargo's Interests In The Force-Placed Insurance Are The Kickbacks, Commissions And Fees It Receives**

72.     Although it may appear that servicers such as Wells Fargo force-place hazard insurance on mortgaged properties to protect against their risk of losing any amounts in the event of damage to the collateral, such "risk" is illusory.

73.     While lenders originate mortgages, these mortgages are frequently packaged into securities and sold to investors, often Fannie Mae or Freddie Mac.  Thereafter, a servicing affiliate of the originating lender often continues to service those mortgages for a fee on behalf of the purchaser of the mortgages but neither the originating lender nor its servicing affiliate bears the risk that the mortgagees will default on the loan or that the collateral on the loan will become impaired.  Rather, that risk is borne by the borrower and/or the current lender/owner of the loan.

74.     Such servicers, including Wells Fargo, thus receive kickbacks and commissions for force-placed insurance policies at the expense of their customers, but with no risk to their own "investment."

**Defendants Routinely Require Redundant or Otherwise Unnecessary Insurance**

75.     Wells Fargo has routinely required borrowers to pay for unnecessary insurance coverage through Assurant.  Such examples include, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the lender's insurable interest in the secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no risk of loss exists for such period; (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement that already protects the lender's interest in the property; and (d) passing on charges to borrowers who are force-placed that are unrelated to the provision of force-placed insurance.

76.     Force-placed hazard insurance policies should not be backdated. The National Association of Insurance Commissioners ("NAIC") has indicated that insurance is "prospective in nature." Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is already no risk of loss is improper. *See, e.g.*, Ties to Insurers ("'[Insurance policies] should not be back-dated to collect premiums for a time period that has already passed'" (quoting the NAIC)).

77.     Moreover, many hazard insurance policies contain a Lender's Loss Payable Endorsement. This endorsement typically protects the lender for a period of at least ten days after the termination of the insurance policy. Accordingly, force-placing insurance policies effective immediately following the termination of the borrower's policy and charging borrowers expensive premiums for such insurance is unlawful and unfair because borrowers are charged for needless and duplicative insurance coverage.

78.     Furthermore, it is well established that an insurance contract is void if the named insured lacks an insurable interest in the property covered under the contract. A lender's insurable interest in the loan collateral is the outstanding loan balance; accordingly, a lender's insurable interest in the mortgaged property is the outstanding loan balance on the mortgage. However, in order to increase the amount of the kickbacks, Defendants routinely force-place insurance coverage greater than the outstanding principal balance on the loans despite the fact that the lender is the named insured on the force-placed policies and only has an insurable interest equal to the outstanding principal balance.

**Defendants' Practices Improperly Inflate Charges to Borrowers for Force-Placed Insurance**

79.     By retaining a commission, participating in a captive reinsurance arrangement, and/or agreeing to other kickbacks, the servicer forces the borrower to pay for both the actual cost of the insurance policy and the cost of the kickback. As *American Banker* observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." *See* Ties to Insurers; *See also* NYDFS March 21, 2013 Press Release at 2. These costs are

1    ultimately paid by the borrowers and serve to unjustly enrich all Defendants, including those with

2    whom the borrower has no contractual relationship, such as Defendants Assurant, Inc. and ASIC.

3        80.    Thus, Defendants' kickback arrangements with force-placed insurance providers tend

4    to keep the amounts charged to borrowers for force-placed insurance artificially inflated over time

5    because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are

6    simply funding illegal kickbacks to servicers.  Amounts paid to servicers as sham reinsurance

7    premiums, commissions and other forms of kickbacks have become a part of the cost of doing

8    business for force-placed insurance providers.  As a result, force-placed insurance premiums

9    incorporate the payment of such kickbacks—to the detriment of consumers.

10       81.    Assurant, Inc. plays a crucial role in the Defendants' force-placement activities as it

11   admits in its SEC filings, public statements, and as evidenced by its role in the NYDFS investigation

12   which ultimately resulted in the entry of a Consent Order to which Assurant was a party.

13       82.    While forced-placed insurers and servicers often attempt to justify the amounts

14   charged to borrowers for force-placed insurance by arguing that force-placed insurance rates in

15   certain states are filed with the respective state's insurance regulator, and are thus not subject to

16   challenge, this defense is wholly inapplicable to Plaintiffs' claims.

17       83.    In those states where force-placed insurance rates are filed with state insurance

18   regulators, the filed rate only encompasses rates charged between insurer and lender/servicers – not

19   the reasonableness of rates charged by the lender/servicers to borrowers.  The state insurance

20   departments do not decide the premiums which would be reasonable as between a lender and its

21   borrowers.

22       84.    Thus, borrowers pay amounts for force-placed insurance that are bloated with charges

23   unrelated to the cost of force-placing their insurance.

24       85.    Upon information and belief, Assurant provided portfolio monitoring and tracking

25   services to Wells Fargo at below market rates.  The small percentage of borrowers who paid for

26   force-placed insurance shouldered the costs of monitoring Wells Fargo's entire loan portfolio –

27   effectively providing kickbacks to Wells Fargo in the form of subsidies paid by borrowers whose

28

1  insurance was force-placed.  Assurant is additionally able to profit through this arrangement by

2  collecting payments for such services that would otherwise not be separately charged to borrowers.

3       86.    As discussed in greater detail below, on March 6, 2012, Fannie Mae issued a Request

4  for Proposal ("RFP") after observing that the existing force-placed insurance system "may

5  encourage Servicers to purchase Lender Placed Insurance from Providers that pay high

6  commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing

7  and terms." *See* Fannie Mae Request For Proposal dated March 6, 2012 attached as Exhibit 15.  The

8  RFP further noted that, in addition to payment of unnecessary commissions/fees, "Fannie Mae is

9  often paying twice for Insurance Tracking services; once via the servicing fee that Fannie May pays

10  to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may

11  include or subsidize the costs of tracking services." *Id.*

12       87.    "The incentives and potential for abuse in the administration of LPI [lender placed

13  insurance] are great.  Consumers do not request the insurance, but are forced to pay for it.  The cost

14  of LPI is much higher than a policy the borrower would purchase on his or her own.  Lenders have

15  incentive to force-place the insurance because the premium includes a commission to the lender and,

16  in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in

17  additional revenue to the lender from the force-placement of the coverage." *See* Birnbaum July 28,

18  2011 Testimony.

19       88.    In addition, "[t]he prices for residential property LPI are significantly excessive.  In

20  2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%.  Incredibly,

21  lenders get a commission—totaling hundreds of millions of dollars—out of these premiums, despite

22  the fact that the insurance is placed to protect the lenders' collateral.  The premiums also include the

23  costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance—so

24  the lenders' cost of tracking all loans is passed only to those consumers paying for force-place [sic]

25  insurance." *Id.*

26  **Defendants Charged Plaintiffs for Redundant or Otherwise Unnecessary Insurance
    Pursuant to Lucrative Pre-Arranged Agreements**

27

28

Giovanni and Ursula Canonico

89.    As required by the mortgage loan, the Canonicos maintained a hazard insurance policy to protect the dwelling as well as other structures, personal property and liability.

90.    On or around March 10, 2012 the policy was not renewed.

91.    Subsequently on or around June 24, 2012, Wells Fargo force-placed a hazard insurance policy on the Canonicos' property.  The force-placed policy was issued by Assurant, Inc. through ASIC and had an annual premium of $1,210, which on information and belief was charged to Plaintiffs' escrow account.  *See,* Canonico WFHM June 24, 2012 Notice of Force Placement (the "Canonico FPI Notice"), attached hereto as Exhibit 16; *see also, Lane v. Wells Fargo Bank, N.A.,* 2013 WL 3187410, at *10 (N.D. Cal. 2013)(citing deposition testimony of Wells Fargo that "the uniform policy [of Wells Fargo] since January 1, 2007, has been to require the borrower to pay funds into escrow to cover any lender-placed insurance charges.")

92.    The Canonico FPI Notice also stated, "Wells Fargo Insurance [Inc.] acts as an agent for the insurance company and will receive a commission on the insurance that was obtained." *See* Canonico FPI Notice.

93.    Although the policy covered the period from March 10, 2012 to March 10, 2013, the policy was purchased by Wells Fargo on or around June 24, 2012 and backdated to March 10, 2012. *See* June 24, 2012 ASIC Hazard Policy (the "Canonico ASIC Policy"), attached hereto as Exhibit 17.

94.    The force-placed policy provided $197,000 in coverage for the dwelling only, *see, id.*; however, on information and belief the unpaid principal balance on the Canonicos' mortgage was substantially less than that amount.

95.    On or around December 4, 2012, the Canonicos obtained voluntary insurance coverage through Mercury Insurance Company.  *See* December 4, 2012 Canonico Declarations Page of Mercury Insurance (the "Mercury Policy"), attached hereto as Exhibit 18.

96.    The Mercury Policy covers the period December 4, 2012 through December 4, 2013. *Id.*  The annual policy premium is $478.00 and covers the dwelling for $331,000, other structures $66,200, personal property $248,250, loss of use $165,500, medical payments of $1,000, and includes personal liability coverage in the amount of $300,000.  *Id.*

97.     The policy force placed by ASIC cost nearly three times as much as the Mercury Policy obtained by the Canonicos and the ASIC Policy provided significantly less coverage.

98.     Upon information and belief, Wells Fargo and the Assurant Defendants received kickbacks in connection with the Canonicos' force-placed policies.

<u>Patrick Ursomano</u>

99.     As required by the mortgage loan, Ursomano maintained a hazard insurance policy to protect the dwelling as well as other structures, personal property and liability.

100.    In or around July 2011 Ursomano's hazard insurance coverage lapsed.

101.    Nearly a year later, on or around May 25, 2012, Wells Fargo sent a letter requesting that Ursomano provide evidence of hazard insurance coverage.  *See,* Ursomano WFHM May 25, 2012 Notice of Insurance Requirement, attached hereto as Exhibit 19.

102.    Subsequently on or around June 29, 2012, Wells Fargo force-placed a 60-Day binder hazard insurance policy on the property which was backdated to July 17, 2011 and provided $261,500 of dwelling-only coverage through September 15, 2011, a two-month period during which there was no loss or claim.  *See,* Ursomano WFHM June 29, 2012 Notice of Binder Force Placement, attached hereto as Exhibit 20.   The force-placed policy was issued by Assurant, Inc. through ASIC and had an annual premium of $1,757.  *Id.*

103.    Then, by notice dated on or around August 15, 2012, Wells Fargo force placed a full-year policy, backdated to July 17, 2011 that provided coverage through July 17, 2012, a period during which there was no loss or claim.  *See,* Ursomano WFHM August 15, 2012 Notice of 2011 Force Placement, (the "2011 FPI Policy") attached hereto as Exhibit 21.  The force-placed policy was issued by Assurant, Inc. through ASIC and  provided $261,500 of dwelling-only coverage and had an annual premium of $1,757.  *Id.*

104.    Shortly thereafter, on or about August 26, 2012, Wells Fargo force placed a full-year *renewal* of the 2011 FPI policy on Ursomano's property.  The force-placed policy was issued by Assurant, Inc. through ASIC and had an annual premium of $1,808.  *See,* Ursomano WFHM August 26, 2012 Notice of Force Placement (the "Ursomano 2012 FPI Notice"), attached hereto as Exhibit 22.

105.     The Ursomano 2012 FPI Notice is dated less than two weeks after the 2011 FPI Policyhad been issued, which itself covered a period more than a year past, during which no losses occurred or claims were made.

106.     The Ursomano 2012 FPI Notice also stated, "Wells Fargo Insurance [Inc.] acts as an agent for the insurance company and will receive a commission on the insurance that was obtained." *Id.*

107.     Although the renewed policy covered the period from July 17, 2012 to July 17, 2013, the policy was purchased by Wells Fargo on or around August 26, 2012 and backdated to July 17, 2012. *See* August 26, 2012 ASIC Hazard Policy (the "Ursomano ASIC Policy"), attached hereto as Exhibit 23.

108.     The force-placed policy provided $269,084 in coverage for the dwelling only, *id.*; however, on information and belief, the unpaid principal balance on Ursomano's mortgage was substantially less than that amount.

109.     On or around September 4, 2013, Ursomano obtained voluntary insurance coverage through Oregon Fair Plan Association. *See* September 4, 2013 Ursomano Declarations Page of Oregon Fair Plan (the "OFP Policy"), attached hereto as Exhibit 24.

110.     The OFP Policy covers the period September 4, 2013 through September 4, 2014. *Id.* The annual policy premium is $495.00 and covers the dwelling in the amount of $151,000 and contents coverage in the amount of $75,000. *Id.*

111.     The policy force placed by ASIC was excessive and cost nearly four times as much as the OFP Policy obtained by Ursomano. The Ursomano ASIC Policy provided no coverage for personal property and thus provided less coverage to Ursomano at a much higher cost.

112.     Each of the policies forced placed by Defendants were charged to Ursomano's escrow account. *See,*Ursomano August 22, 2012 Escrow Statement, attached hereto as Exhibit 25; *see also, Lane v. Wells Fargo Bank, N.A.*, 2013 WL 3187410, at *10 (N.D. Cal. 2013)(citing deposition testimony of Wells Fargo that "the uniform policy [of Wells Fargo] since January 1, 2007, has been to require the borrower to pay funds into escrow to cover any lender-placed insurance charges.")

113.    Upon information and belief, Wells Fargo and the Assurant Defendants received kickbacks in connection with Ursomano's force-placed policies.

**Government Response**

114.    Force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are force-placed in insurance following a lapse in their policies.  *See* American Banker, *Under Interrogation*, January 27, 2012 5:03 PM, available at http://www.americanbanker.com/news/force-placed-insurance-subpoenas-1046159-1.html, (last visited Sept. 19, 2013); Gretchen Morgenson, *Hazard Insurance With Its Own Perils*, New York Times, Page BU1 (Jan. 22, 2012); *see also* Louise Story, *Big Banks Face Inquiry Over Home Insurance*, New York Times, Page B1 (Jan. 10, 2012).

115.    Thus, state attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance.  Recently, a coalition of forty-nine (49) state attorneys general entered into a historic joint state-federal settlement agreement with the country's five largest loan servicers, including Wells Fargo ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis.  *See* www.nationalmortgagesettlement.com/ (official website established by the government relating to the settlement)(last visited Sept. 19, 2013); *see also* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, American Banker (Mar. 10, 2011, 12:25 PM) (http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html) (last visited Sept. 19, 2013).

116.    Among other terms, the settlement essentially prohibits servicers from profiting from force-placed insurance.  Specifically, under the settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) must work with the borrower to continue or reestablish the existing homeowner's policy; (c) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (d) must purchase the force-placed insurance for a commercially reasonable price.  *Id.*; *see also Consent Judgment, United States of*

1  *America v. Bank of America Corp.,* Civ. No. 1:12-cv-00361-RMC (D.D.C Apr. 14, 2012) (ECF No.

2  14 Section VII).

3         117.   The Consumer Financial Protection Bureau issued two notices on proposed rules "to

4  protect homeowners from surprises and costly mistakes by their mortgage servicers," which included

5  specific provisions for "avoiding costly force-placed insurance." *See* Consumer Financial Protection

6  Bureau      Proposes     Rules     to     Protect     Mortgage     Borrowers"     available     at

7  http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-

8  rules-to-protect-mortgage-borrowers/ (last visited Sept. 19, 2013).

9         118.   These rules became final on January 17, 2013.  The new regulations prohibit servicers

10  of federally regulated mortgage loans from force-placing insurance unless a servicer has a reasonable

11  basis to believe that the borrower's insurance has lapsed.  Servicers must provide notice of force-

12  placement three times at 45, 30 and 15 days in advance of issuing a policy.  Moreover, the charge for

13  any service that was actually performed must "bear a reasonable relationship to the servicers cost of

14  providing the service.  A servicer cannot force-place insurance if the borrower has an existing

15  escrow account if the servicer can continue the existing insurance, even if the servicer must advance

16  the funds for the insurance." *See* Summary of Final Mortgage Servicing Rules dated January 17,

17  2013 available at http://files.consumerfinance.gov/f/201301_cfpb_servicing-rules_summary.pdf (last

18  visited Sept. 19, 2013). *See also*, 12 CFR 1024.

19         119.   In its March 6, 2012 RFP, Fannie Mae stated that it had conducted an "extensive

20  internal review" of the lender-placed insurance process, and found that the process "can be improved

21  through unit price reductions and fee transparency to the benefit of both the taxpayers and

22  homeowners."  In particular, Fannie Mae made the following observations:

23         • "Lender Placed Insurers often pay commissions/fees to Servicers for placing
24           business with them.  The cost of such commissions/fees is recovered in part
              or in whole by the Lender Placed Insurer from the premiums[.]"

25         • "The existing system may encourage Servicers to purchase Lender Placed
26           Insurance from Providers that pay high commissions/fees to the Servicers and
              provide tracking, rather than those that offer the best pricing and terms . . . .
27           Thus, the Lender Placed Insurers and Servicers have little incentive to hold
              premium costs down."

28

- "[M]uch of the current lender placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner."

*See*, Fannie Mae RFP.

120. Fannie Mae stated that it sought to "[r]estructure the business model to align Servicer incentives with the best interest of Fannie Mae and homeowners." Among other things, Fannie Mae sought to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae" and to "[s]eparate the commissions and fees for Insurance Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability." *Id.* at *3*.

121. On March 25, 2013, the Federal Housing Finance Agency ("FHFA") issued a Notice regarding Lender Placed Insurance. This Notice "sets forth an approach to address certain practices relating to lender placed insurance that the [FHFA] considers contrary to prudent business practices [and] to appropriate administration of Fannie Mae and Freddie Mac (the Enterprises) guaranteed loans," and which result in "litigation and reputational risks." *See* Federal Housing Finance Agency, No. 2013-05 Lender Placed Insurance, Terms and Conditions attached as Exhibit 26.

122. FHFA prohibits:

> <u>Certain Sales Commissions</u>. The Enterprises shall prohibit sellers and servicers from receiving, directly or indirectly, remuneration associated with placing coverage with or maintaining placement with particular insurance providers.

123. The FHFA acknowledged:

- "Reportedly, premiums for lender placed insurance are generally double those for voluntary insurance and, in certain instances, significantly higher." *Id*. at 2.

- "[T]he multiples involved may not reflect claims experience..." *Id*.

- "Loss ratios for lender placed insurance are significantly below those for voluntary hazard insurance and some states have required or have considered rate reductions of 30 percent or more." *Id*.

124. "Concerns about lender placed insurance costs, compensation and practices have been raised by the National Association of Insurance Commissioners, state regulators, the Consumer Financial Protection Bureau, state attorneys general and consumer organizations. Generally, the focus has centered on excessive rates and costs passed on to borrowers, as well as commissions and

other compensation paid to servicers by carriers.  In order to keep lender placed insurance costs to the Enterprises as low as possible, practices that provide incentives for and do not deter higher costs should be avoided."  *Id.* at 3.

## CLASS ACTION ALLEGATIONS

125.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Classes for the maximum time period allowable by law:

> All persons who have or had a residential mortgage loan or line of credit owned, originated or serviced by Wells Fargo or Wells Fargo Home Mortgage secured by property located in the United States and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property (the "Nationwide Class");

> All persons who have or had a residential mortgage loan or line of credit owned, originated or serviced by Wells Fargo or Wells Fargo Home Mortgage secured by property located in the State of California and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property (the "California Subclass");

The Nationwide Class and California Subclass are referred to collectively as the "Classes."

126.   The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

127.   The Classes are each so numerous that joinder of all members is impracticable.

128.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

129.   Plaintiffs' claims are typical of the claims of each of the Classes.

130.   There are questions of law and fact common to the Classes, the answers to which will advance the resolution of the claims of all of the members of the Classes and that include, without limitation:

(a)    Whether Defendants maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

(b)    Whether Defendants or their subsidiaries or affiliates received commissions or any other payments or things of value from force-placed insurance providers;

1        (c)     Whether Defendants or their subsidiaries or affiliates participated in

2   arrangements that involved kickbacks;

3        (d)     Whether Defendants or their subsidiaries or affiliates received reinsurance

4   premium payments from force-placed insurance providers;

5        (e)     Whether Defendants received financial benefits from the force-placed

6   insurance providers in the form of insurance monitoring, tracking and processing services;

7        (f)     Whether Defendants' force-placed insurance policies were provided by an

8   affiliated entity;

9        (g)     Whether Defendants received unauthorized and illicit payments in connection

10  with force-placed insurance that were unrelated to a *bona fide* service in connection with the force-

11  placed insurance and its purpose;

12        (h)     Whether Defendants received payments in connection with force-placed

13  insurance that exceeded the value of any services actually performed or that were otherwise

14  commercially unreasonable;

15        (i)     Whether Defendants improperly backdated forced-placed insurance policies;

16        (j)     Whether Defendants required unnecessary or duplicative force-placed

17  insurance;

18        (k)     Whether Defendants' conduct constituted an unconscionable business

19  practice;

20        (l)     Whether Defendants' business practices alleged herein are deceptive acts or

21  practices;

22        (m)     Whether Defendants violated the BHCA;

23        (n)     Whether Defendants are liable to Plaintiffs and the Classes for damages and, if

24  so, the measure of such damages; and

25        (o)     Whether Plaintiffs and the Classes are entitled to declaratory, injunctive, and

26  other equitable relief.

27      131.    These and other questions of law and fact are common to the Classes and

28  predominate over any questions affecting only individual members of the Classes.

1    132.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes.

2    Plaintiffs have no claims antagonistic to those of the Classes.  Plaintiffs have retained counsel

3    competent and experienced in complex nationwide class actions, including all aspects of this

4    litigation.  Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the

5    Classes.

6    133.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of

7    separate actions by or against individual members of the Classes would create a risk of inconsistent

8    or varying adjudications with respect to individual members of the Classes, which would establish

9    incompatible standards of conduct for Defendants.

10    134.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution

11    of separate actions by or against individual members of the Classes would create a risk of

12    adjudications with respect to individual members of the Classes which would, as a practical matter,

13    be dispositive of the interests of the other members not parties to the adjudications or substantially

14    impair or impede their ability to protect their interests.

15    135.    Class action status is also warranted under Rule 23(b)(2) because Defendants have

16    acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate

17    final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

18    136.    Class action status is also warranted under Rule 23(b)(3) because questions of law or

19    fact common to the members of the Classes predominate over any questions affecting only

20    individual members, and a class action is superior to other available methods for the fair and

21    efficient adjudication of this controversy.

22    **CLAIMS FOR RELIEF**

23    **COUNT ONE**
     **VIOLATION OF THE ANTI-TYING PROVISIONS OF THE BANK HOLDING**
24    **COMPANY ACT, 12 U.S.C. §1972 ET SEQ.**
     **(AGAINST WFBNA)**
25
     137.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were
26
     fully set forth herein.
27

28

138.     Wells Fargo's kickback scheme violates the anti-tying provisions of the BHCA, 12 U.S.C. § 1972, *et seq*.

139.     The BHCA, 12 U.S.C. § 1972(b), states that "a bank shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement . . . (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company."

140.     WFI is an affiliate of WFBNA.

141.     Wells Fargo's purchase of insurance on borrowers' behalf is a service that Wells Fargo offers to its borrowers. To accept this service, borrowers must agree to pay a commission or other monetary and/or nonmonetary remuneration directly or indirectly to WFI for unidentified services.

142.     Upon information and belief, WFBNA, WFI, and Assurant entered into contractual arrangements under which WFI would act as the "broker" or "agent" for force-placed insurance policies purchased on behalf of WFBNA's borrowers. Under these agreements WFI received a guaranteed commission or other direct or indirect monetary and/or nonmonetary remuneration for every force-placed insurance policy procured on behalf of WFBNA's borrowers equal to a set percentage of the premium for each policy.

143.     WFI does not engage in any insurance broker or agent services. For example, it does not seek out competitive insurance policies from different insurance providers, but refers all force-placed insurance business to Assurant.

144.     This is an unusual banking practice. Wells Fargo's exclusive agreement with Assurant obviates any opportunity for WFI to actually earn commissions or other direct or indirect monetary and/or nonmonetary remuneration.

145.     The "tied product" in this arrangement is WFI's "service" of accepting commissions or other direct or indirect monetary and/or nonmonetary remuneration for unspecified or nonexistent services as an "insurance agent" for force-placed insurance.

146.     The "tying product" is WFBNA's purchase of force-placed insurance for borrowers.

147.   WFBNA also ties its continued extension of credit to Plaintiffs' agreement to pay WFI's commissions or other direct or indirect monetary and/or nonmonetary remuneration. WFBNA would foreclose on Plaintiffs' homes if they refused to pay charges for force placed insurance which include commissions or other direct or indirect monetary and/or nonmonetary remuneration. WFBNA rolled these costs into the FPI policies and charged these payments to Plaintiffs' escrow accounts.

148.   WFBNA ties the procurement of insurance on borrowers' behalf to WFI's "service" as alleged above.

149.   These practices are anti-competitive:

(a)   WFBNA's force-placed insurance arrangement usurps market share from other insurance agencies in favor of its own subsidiary WFI. Force-placed insurance may be a more costly option than purchasing insurance on the open market, but it is a significantly easier and less demanding option.

(b)   WFBNA refers all force-placed insurance business to WFI and guarantees WFI's commissions or other direct or indirect monetary and/or nonmonetary remuneration. The amounts paid are based on contracts between WFBNA and Assurant, not on any services actually provided by WFI. WFI has no competitive incentive to provide any services for borrowers.

(c)   WFBNA sets the amount of commissions or other direct or indirect monetary and/or nonmonetary remuneration that WFI will receive. The substantial revenue that Assurant receives in premiums from WFBNA borrowers gives it an incentive to agree to any rate that WFBNA demands.

(d)   WFBNA's tying arrangement results in unreasonably high commissions or other direct or indirect monetary and/or nonmonetary remuneration. Assurant provides more limited insurance policies than borrowers can obtain on the market but these policies cost significantly more than other policies the borrowers would obtain on the open market.

(e)   Unlike regular insurance agency arrangements, WFBNA utilizes its power as borrowers' mortgage lender and/or servicer to guarantee payment of commissions or other direct or indirect monetary and/or nonmonetary remuneration. WFBNA withdraws insurance premiums

1  (which include commissions or other direct or indirect monetary and/or nonmonetary remuneration)

2  directly from borrowers' escrow accounts to pay its subsidiary, WFI.  If borrowers refuse to make

3  payments to their escrow account, WFBNA coerces them into doing so with negative credit

4  reporting and, potentially, foreclosing on their homes.  Thus, WFBNA uses its power as borrowers'

5  bank to steer commissions or other direct or indirect monetary and/or nonmonetary remuneration to

6  itself through WFI.

7         (f)    WFBNA's exclusive purchase arrangement and kickback scheme artificially

8  inflates the price of force-placed insurance and artificially increases commissions or other direct or

9  indirect monetary and/or nonmonetary remuneration to WFBNA's captive insurance agent.  The

10  artificially-inflated premiums associated with Assurant's force-placed insurance are made possible

11  because WFBNA refers 100% of its force-placed insurance business to Assurant. As one of the

12  nation's largest mortgagees and mortgage servicers, WFBNA's exclusive force-placed insurance

13  referrals can and do substantially affect competitive incentives to reduce prices. This guarantees

14  distorted payments to WFI, whose commissions or other direct or indirect monetary and/or

15  nonmonetary remuneration are a percentage of Assurant's inflated premiums.

16       150.    WFI remits to and/or shares with WFBNA its profits, whether through direct money

17  transfers, indirect money transfers through WFBNA's holding company, or "soft dollar" transfers.

18       151.    Plaintiffs and the Classes have been damaged by WFBNA's anticompetitive tying

19  arrangement in that they have paid excessive commissions or other direct or indirect monetary

20  and/or nonmonetary remuneration to WFBNA through its subsidiary WFI.

21  **COUNT TWO**

22  **VIOLATION OF CALIFORNIA BUSINESS**
23  **& PROFESSIONS CODE § 17200, ET SEQ.**
**(AGAINST ALL DEFENDANTS)**

24       152.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though

25  fully set forth herein.

26       153.    Plaintiffs bring their section 17200 claim on behalf of themselves and all borrowers

27  who were (1) charged for force-placed insurance premiums that included kickbacks to Wells Fargo

28  or its affiliates, or (2) force-placed into backdated or excessive insurance policies.

154.   Defendants were required to adhere to the requirements of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. ("UCL"), when conducting business with Plaintiffs and members of the Classes.

155.   The UCL does not operate "extraterritorially" outside of California, but does reach claims made by out-of state residents harmed by unlawful conduct occurring inside California.

156.   The principal decision makers at Wells Fargo involved in the underlying conduct alleged herein were located in California.  Wells Fargo's operations in San Francisco were the locus of the decisions (and/or ratification of decisions) to enter into agreements with Assurant to force-place with Assurant backdated and/or excessive insurance on borrowers throughout the United States and to force place policies that generated kickbacks in the form of below-market-rate portfolio tracking, or a commission, fee, reinsurance or any other monetary and/or nonmonetary remuneration to a WFBNA affiliate, including WFI.

157.   The UCL prohibits any "unlawful" business act or practice.  Defendants have violated the UCL's prohibition against engaging in unlawful acts or practices by violating the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1972 *et seq*.

158.   Plaintiffs reserve the right to allege other violations of law that constitute other unlawful business acts or practices.

159.   The UCL also prohibits any "unfair" business act or practice. As detailed in the preceding paragraphs, Defendants engaged in unfair business acts or practices by, among other things, charging borrowers for force-placed insurance premiums that included kickbacks to Wells Fargo, and by force-placing borrowers into backdated and excessive insurance policies.

160.   Defendants systematically engaged in these unfair and unlawful business practices to the detriment of Plaintiffs and other members of the Classes.

161.   The harm caused by these business practices vastly outweighs any legitimate business utility they possibly could have.

162.   Plaintiffs and other members of the Classes have been injured and have suffered a monetary loss as a result of Defendants' violations of the UCL. They are entitled to restitution in an

1  amount to be determined at trial, and an injunction requiring Defendants to cease their unlawful and

2  unfair business practices as described herein.

3         163.    As a result of Defendants' violations of the UCL, Plaintiffs are also entitled to recover

4  attorneys' fees and costs to be paid by Defendant, as provided by Cal. Code of Civil Procedure §

5  1021.5 and other applicable law.

6  **PRAYER FOR RELIEF**

7         WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in

8  favor of Plaintiffs and the Classes and award the following relief:

9         A.    That this action be certified as a class action pursuant to Rule 23 of the Federal Rules

10  of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as

11  counsel for the Classes;

12         B.    That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

13         C    Compensatory, consequential, and general damages in an amount to be determined at

14  trial;

15         D.    Restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of

16  an equitable constructive trust over all such amounts for the benefit of the Classes;

17         E.    A judgment declaring that Defendants must cease the activities described herein, and

18  provide members of the Classes with adequate remedies, including, without limitation, refunds or

19  credits of all unfair, unlawful or otherwise improper force-placed insurance premiums, and provide

20  for adequate policies and procedures to ensure that Defendants' unlawful conduct does not continue,

21  including, without limitation, that Defendants: (a) are prohibited from force-placing insurance when

22  the servicer knows or has reason to know that the borrower has a policy in effect that meets the

23  minimum requirement of the loan documents; (b) are prohibited from force-placing excessive hazard

24  insurance; (c) are prohibited from purchasing force-placed insurance from a subsidiary, affiliate, or

25  any entity in which they have an ownership interest; (d) are prohibited from splitting fees, giving or

26  accepting kickbacks or referral fees, or accepting anything of value in relation to the purchase or

27  placement of force-placed insurance; (e) must make reasonable efforts to continue or reestablish the

28  borrower's existing insurance policy if there is a lapse in payment; (f) must purchase any force-

1  placed insurance for a commercially reasonable price; and (g) are prohibited from backdating force-

2  placed insurance policies absent evidence of damage to the property or claims arising out of the

3  property during any lapse periods;

4          F.        Costs and disbursements of the action;

5          G.        Pre- and post-judgment interest;

6          H.        Reasonable attorneys' fees; and

7          I.        Such other and further relief as this Court may deem just and proper.

8  <u>**DEMAND FOR JURY TRIAL**</u>

9         Plaintiffs hereby demand a trial by jury as to all claims in this action.

10  Dated:  October 4, 2013               Respectfully submitted,

11                                       **KESSLER TOPAZ MELTZER**

12                                       **& CHECK, LLP**

13                                     */s/ Ramzi Abadou*

14                                     Ramzi Abadou (SBN 222567)

                                   One Sansome Street, Suite 1850

15                                     San Francisco, CA 94104

                                   Telephone:  (415) 400-3000

16                                     Facsimile:  (415) 400-3001

                                   Email: <u>rabadou@ktmc.com</u>

17                                     *and*

18

19                                     Edward W. Ciolko (*pro hac vice forthcoming*)

                                   Peter A. Muhic (*pro hac vice forthcoming*)

20                                     280 King of Prussia Road

                                   Radnor, PA  19087

21                                     Telephone: (610) 667-7706

                                   Facsimile: (610) 667-7056

22                                     Email:  <u>eciolko@ktmc.com</u>

23                                            <u>pmuhic@ktmc.com</u>

24                                     ***Attorneys for Plaintiffs and the Proposed Classes***

25

26

27

28